**2021 UT 53**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

In the Matter of the Discipline of TRAVIS L. BOWEN, #397

OFFICE OF PROFESSIONAL CONDUCT,
*Appellee,*

*v.*

TRAVIS L. BOWEN,
*Appellant.*

No. 20190288
Heard September 16, 2020
Filed September 2, 2021

On Appeal of Interlocutory Order

Third District, Salt Lake
The Honorable Royal I. Hansen
No. 150907128

Attorneys:
Billy L. Walker, Adam C. Bevis, Salt Lake City, for appellee

Troy L. Booher, Dick J. Baldwin, Salt Lake City,
for appellant

JUSTICE PEARCE authored the opinion of the Court in which
JUSTICE HIMONAS and JUSTICE PETERSEN joined.

CHIEF JUSTICE DURRANT filed an opinion concurring in part and
dissenting in part.
ASSOCIATE CHIEF JUSTICE LEE filed an opinion concurring in part and
dissenting in part.

JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶1 Attorney Travis L. Bowen (Bowen) entered into fee agreements in which his clients agreed to give Bowen a flat fee that would be treated as earned the moment it was paid. Bowen deposited

these fees directly into his operating account. The Utah State Bar's Office of Professional Conduct (OPC) brought a disciplinary action against Bowen alleging that his practices violated Utah Rule of Professional Conduct 1.15(c). Rule 1.15(c) requires an attorney to keep fees that are paid in advance in a client trust account until the attorney earns them. At that point, the attorney may transfer the fees to her operating account. UTAH R. PRO. CONDUCT 1.15(c).

¶2 Bowen moved for summary judgment advancing two arguments. He first argued that his flat fee agreements did not violate rule 1.15(c). Bowen next argued that, even if his flat fee agreements ran afoul of the rule, the OPC could not prosecute him because another Utah Rule of Professional Practice provides safe harbor (Safe Harbor Rule) to lawyers whose actions are "in compliance" with an ethics opinion that has not been "withdrawn." *See* SUP. CT. R. PRO. PRAC. 14-504(d) (2019), *amended by and renumbered as* 11-522 (2020). And Bowen pointed to an ethics advisory opinion that he claimed authorized the fee arrangement he used with his clients.

¶3 The district court denied Bowen's motion for summary judgment. Bowen petitioned this court for permission to appeal from the district court's interlocutory order. We agreed to hear the interlocutory appeal and now affirm the district court in part and reverse in part. We conclude that Bowen's practices violated rule 1.15(c), but we also recognize that some, but not all, of Bowen's conduct finds refuge in our Safe Harbor Rule.

## BACKGROUND

¶4 In April 2011, Bowen entered into a flat fee agreement with Diane Brinson (Brinson contract). Bowen agreed to provide Brinson with a "Risk Assessment" and then an "Initial Design" for an "Asset Protection System™." Under the contract, Brinson was to pay Bowen $10,000.

¶5 The Brinson contract described this payment as a "flat fee."[1] The contract explained:

> The flat fee shall constitute immediate compensation for our commitment to perform future legal services and will be deposited into our general operating account. In the event that the project is not completed for any

---

[1] "A flat fee is an advance fee payment intended to compensate a lawyer for all work to be done on a matter or a discrete aspect thereof, regardless of the time required or the complexity of the assignment." Douglas R. Richmond, Understanding Retainers and Flat Fees, 34 J. LEGAL PROF. 113, 132 (2009).

reason, any unearned fees will be refunded to you in accordance with the Utah Rules of Professional Conduct.

Bowen received Brinson's payment and he deposited it directly into his operating account.

¶6 On December 2, 2012, Bowen entered into flat fee agreements with two clients: Nuno Battaglia and Griffin Johnson (Battaglia and Johnson contracts). The Battaglia and Johnson contracts contained the same language as the Brinson contract. Bowen agreed to provide Battaglia and Johnson the "Risk Assessment" and "Initial Design" for an "Asset Protection System™." And Battaglia and Griffin were required to pay Bowen a $10,000 "flat fee."

¶7 Bowen received Battaglia and Johnson's payments and deposited both directly into his firm's operating account.

¶8 Eventually, Brinson, Battaglia, and Johnson submitted informal complaints against Bowen to the OPC, alleging misconduct. A Screening Panel of the Ethics and Discipline Committee of Utah Supreme Court (Screening Panel) heard these complaints.[2] The Screening Panel considered if there was probable cause that Bowen violated two of the Rules of Professional Conduct: rule 1.5 and rule 1.15.[3]

¶9 The Screening Panel found there was no probable cause Bowen had violated rule 1.5 of the Rules of Professional Conduct. The Screening Panel wrote: "The panel has significant concerns about a potential Rule 1.5(a) violation. However, there was not sufficient evidence in the record to establish probable cause of the violation because there was no competent evidence the fees were not

---

[2] The Utah Rules of Professional Practice creates screening panels composed of five members of the Utah State Bar's Ethics and Discipline Committee, including four attorneys and one public member. SUP. CT. R. PRO. PRAC. 11-511(a). Informal complaints against attorneys are assigned randomly to a screening panel. *Id.* 11-511(g)(1). The panels review and hear these complaints to determine what action, if any, should be taken in response. *Id.*

[3] Rule 1.5 of the Utah Rules of Professional Conduct prohibits lawyers from charging unreasonable fees. UTAH R. PRO. CONDUCT 1.5(a). Rule 1.15 requires that lawyers keep their personal funds separate from their clients' funds. *Id.* 1.15(a).

(continued . . .)

reasonable." Thus, the Screening Panel dismissed claims under rule 1.5(a).

¶10 But the Screening Panel found probable cause that Bowen had violated Rule 1.15(c). Specifically, the Panel concluded that Bowen "did not meet the *Jardine* factors in demonstrating that the fees were immediately earned."[4]

¶11 The OPC brought a complaint against Bowen in the Third Judicial District Court alleging two violations of rule 1.15(c) of the Utah Rules of Professional Conduct: one arising from the 2011 Brinson contract and the other from the 2012 Battaglia and Johnson contracts.

¶12 Bowen moved for summary judgment. Bowen argued that he was entitled to safe harbor from prosecution under the Safe Harbor Rule of the Utah Rules of Professional Practice. *See* Sup. Ct. R. Pro. Prac. 14-504(d) (2019), *amended by and renumbered as* 11-522 (2020). The rule states, "The OPC shall not prosecute a Utah lawyer for conduct that is in compliance with an ethics advisory opinion that has not been withdrawn at the time of the conduct in question." *Id.*

¶13 Bowen argued that the Brinson contract "fully complied" with ethics advisory Opinion 136. That opinion states, "Under appropriate conditions, a nonrefundable retainer may be considered earned when paid and, therefore, may be deposited into the attorney's operating account rather than his [or her] trust account." *Utah State Bar Ethics Advisory Op. 136*, 1993 WL 755253, at *1. Bowen claimed that he satisfied the "appropriate conditions" Opinion 136 outlines. He

---

[4] The *Jardine* standard that the Screening Panel referenced harks back to this court's holding in *Utah State Bar v. Jardine* (*In re Discipline of Jardine*), 2012 UT 67, 289 P.3d 516. Among other things, *Jardine* stands for the proposition that client consent alone is not sufficient for a lawyer to treat an attorney fee as "earned upon receipt." *See* 2012 UT 67, ¶¶ 51–53 But at the same time, *Jardine* acknowledged that there are certain circumstances when an attorney earns a fee the moment it is paid. For example, a fee may be earned when paid if the attorney "provided a substantial benefit for his client by virtue of having a 'towering reputation. . . .'" *Id.* ¶ 53. Or when the attorney's "commitment to be available had value in and of itself beyond the usual attorney/client relationship. . . ." *Id.* And where the attorney's "acceptance of matters disqualified him from accepting other matters. . . ." *Id. Jardine* left open the possibility that there might be "similar exception[s] to the general rule" that would allow an attorney to earn a fee when it was paid, but client consent alone was not one of them. *See id.*

argued that his "conduct is as unsurprising as it is unobjectionable — he was fully aware of, he carefully read and understood, and he relied upon [Opinion] 136 in structuring his engagement with [Brinson] and drafting the Brinson Agreement."

¶14 Bowen also argued that his 2012 Battaglia and Johnson contracts complied with Opinion 136. Bowen acknowledged that, unlike the Brinson contract, these contracts were formed after this court interpreted Opinion 136 in *Utah State Bar v. Jardine* (*In re Discipline of Jardine*), 2012 UT 67, 289 P.3d 516. However, Bowen argued this court's holding in *Jardine* was not relevant because "*Jardine* did not overrule [Opinion] 136." Therefore, Bowen argued Opinion 136 was the "only relevant advisory opinion" for the purposes of the Safe Harbor Rule and ought to define the boundaries of the harbor in which he sought safety.

¶15 The OPC opposed Bowen's motion for summary judgment, arguing that Bowen's contracts were inconsistent with Opinion 136. The OPC also averred that *Jardine* should be the "definitive authority in this case." Using language similar to the Screening Panel's, OPC argued that Bowen could not have earned the fees he deposited into his operating account under the "*Jardine* standard."

¶16 The district court denied Bowen's motion for summary judgment. The district court rejected Bowen's contention that his retainer agreement was consistent with Opinion 136, as interpreted by *Jardine*.

¶17 The district court explained that,

> [T]he bases for consideration of a fee as earned on receipt detailed in *Jardine* all require examination of factors independent of the fee agreement—to wit, whether an attorney has a "towering reputation," whether his commitment to be available had independent value to the client, or whether his acceptance of the matters disqualified him from accepting other matters. Thus, [Bowen's] approach—which would end the analysis at the language set forth in the fee agreement—is not similar to the other exceptions detailed in *Jardine*.

The district court used *Jardine* as the standard to evaluate all of Bowen's contracts. And the court concluded the rules did not afford Bowen safe harbor for his conduct. The district court therefore denied Bowen's motion for summary judgment.

¶18 Bowen petitioned for permission to appeal from the district court's interlocutory order denying summary judgment. We granted that request.

## STANDARD OF REVIEW

¶19 The Utah Constitution gives this court "plenary authority to govern the practice of law. This authority is derived both from our inherent power and—since 1985—explicit and exclusive constitutional power." *Injured Workers Ass'n of Utah v. State*, 2016 UT 21, ¶ 14, 374 P.3d 14; UTAH CONST. art. VIII, § 4 ("The Supreme Court by rule shall govern the practice of law, including . . . discipline of persons admitted to practice law."); *see Barnard v. Utah State Bar*, 804 P.2d 526, 528 (Utah 1991) ("[T]he authority of this Court to regulate the admission and discipline of attorneys existed as an inherent power of the judiciary from the beginning."); *In re Burton*, 246 P. 188, 199 (Utah 1926) ("[This court's] power to deal with its own officers, including attorneys, is inherent, continuing, and plenary, and exists independently of statute . . . .").

¶20 This court reviews for correctness a district court's interpretation of the Utah Rules of Professional Practice, including the Rules of Professional Conduct. *Long v. Ethics & Discipline Comm. of the Utah Sup. Ct.*, 2011 UT 32, ¶ 24, 256 P.3d 206.

## ANALYSIS

### I. THE LAW OF FLAT FEES

¶21 To better understand Bowen's arguments, it helps to consider how the law surrounding flat fee agreements has developed. This requires us to examine two rules, two ethics opinions, and one Utah Supreme Court case.

#### A. Utah Rules of Professional Conduct

¶22 Rule 1.5 of the Utah Rules of Professional Conduct prohibits lawyers from charging unreasonable fees. "A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses." UTAH R. PRO. CONDUCT 1.5(a). The rule lists eight factors to be considered in assessing the reasonableness of a fee. Those factors include: "the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer"; "the experience, reputation and ability of the lawyer or lawyers performing the services"; and "whether the fee is fixed or contingent." *Id.* 1.5(a)(2), (7), (8).

¶23 Rule of Professional Conduct 1.15 requires an attorney to keep the client's property separate from her own. The rule dictates:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. . . .
(b) A lawyer may deposit the lawyer's own funds in a client trust account for the sole purpose of paying bank service charges on that account, but only in an amount necessary for that purpose.
(c) A lawyer shall deposit into a client trust account legal fees and expenses that have been paid in advance, to be withdrawn by the lawyer only as fees are earned or expenses incurred.

UTAH R. PRO. CONDUCT 1.15(a)-(c). Thus, the rule creates a wall between client funds and attorney funds. *See id.* 1.15(a). This wall can only be breached under the limited circumstances the rule describes: when a lawyer pays bank charges on a client trust account, or when a lawyer earns fees or incurs expenses. *Id.* 1.15(b)-(c).

*B. Opinion 136*

¶24 In July 1993, the Utah State Bar Ethics Advisory Opinion Committee (EAOC) approved Opinion 136.[5]

¶25 Opinion 136 answers the following question: "Can an advance payment made by a client ever be characterized as a 'fixed fee' or 'nonrefundable retainer,' which would be earned by the attorney when received and therefore not deposited into a trust account?" *Utah State Bar Ethics Advisory Op. 136*, 1993 WL 755253, at *1. Opinion 136 answers this question in the affirmative. *Id.* The opinion explains that "[u]nder appropriate conditions, a nonrefundable retainer may be considered earned when paid and, therefore, may be deposited into the attorney's operating account rather than his [or her] trust account." *Id.*

¶26 Opinion 136 reasons that rule 1.5 of the Rules of Professional Conduct does not prohibit all "nonrefundable retainers." *Id.* Indeed, Opinion 136 notes that "nonrefundable retainers" are not "specifically prohibited" by rule 1.5. *Id.* Because it could find no express statement in the rules about such fee arrangements, the EAOC considered how other jurisdictions had dealt with the question.

_____

[5] The EAOC is a standing committee of the Utah State Bar. The EAOC answers requests for ethics advisory opinions related to the practice of law in Utah. No court is "bound by an ethics opinion's interpretation of the Rules of Professional Conduct. . . ." SUP. CT. R. PRO. PRAC. 11-522(a) (2020).

¶27 Opinion 136 ultimately preferred the reasoning of the courts that conclude that rule 1.5 allows nonrefundable retainers in certain circumstances. *Id.* at *2–3. The EAOC appears to have been persuaded by courts that evaluate "nonrefundable retainers" "in terms of whether the total fee was reasonable and not whether any portion of it is nonrefundable." *Id.* at *1. Therefore, Opinion 136 concluded that "whether a fixed-fee agreement is clearly excessive depends on whether the total fee meets the standards set out in Rule 1.5 and not on whether any part of it is treated in the fee agreement as nonrefundable." *Id.* at *3. In other words, there is no per se prohibition on "nonrefundable retainers" — they should be evaluated on a case-by-case basis. *See id.*

¶28 Opinion 136 suggests that to comply with the Rules of Professional Conduct, nonrefundable retainers should meet three conditions:

> The fee agreement should . . . clearly set forth (a) what portion of the retainer is considered to be nonrefundable, (b) that nonrefundability is conditioned on the absence of default by the lawyer, and (c) what circumstances may entitle the client to a disgorgement of all or part of the "nonrefundable" amount.[6]

*Id.* If these conditions are met, Opinion 136 states that "[s]ince the 'nonrefundable' portion [of the fee] is considered earned upon payment, it may be deposited into the attorney's general operating account rather than in his [or her] trust account." *Id.*[7] This is, however, contingent upon the nonrefundable fee being reasonable.

## C. Jardine *and the* Jardine *Standard*

¶29 Nine years later, this court examined a retainer that purported to be earned when payed in *Utah State Bar v. Jardine* (*In re Discipline of Jardine*), 2012 UT 67, 289 P.3d 516. The OPC accused Nathan N. Jardine of violating a fistful of rules of professional conduct.[8] *Id.* ¶ 1. These accusations arose out of four different client

---

[6] If you are having trouble wrapping your head around how a nonrefundable fee could be disgorged in some circumstances and still be called nonrefundable, you are not alone. Spoiler alert: if you keep reading, you won't need to understand how. *See infra* ¶44.

[7] Opinion 136 never expressly invokes rule 1.15, although the opinion's reasoning presupposes its existence and influence.

[8] The alleged violations included: rule 1.1 (Competence); rule 1.2(a) (Scope of Representation); rule 1.3 (Diligence); rule 1.4(a)

(continued . . .)

representations. *Id.* ¶ 2. The most salient for the purposes of this discussion involves the Susan Mecham matter (Mecham Matter).

¶30 In the Mecham Matter, Jardine entered into an agreement that called for Mecham to pay Jardine a non-refundable retainer of $10,000. *Id.* ¶ 12. According to the contract, "[s]aid retainer is earned at the moment Client signs this contract." *Id.* Furthermore, the contract stated that "[t]he parties agree that **THIS RETAINER IS NON-REFUNDABLE.**"[9] *Id.* And the contract provided that this non-refundable retainer would be directly deposited into Jardine's operating account. *Id.*

¶31 Jardine received his $10,000 from Mecham and, true to his word, deposited it directly into his operating account. *Id.* ¶ 14. The OPC contended that Jardine violated both rule 1.5 and rule 1.15. *Id.* ¶ 17. The district court agreed. *Id.* ¶¶ 46, 53.

¶32 On appeal, this court reversed the district court's rule 1.5 determination. *Id.* ¶ 46. This court found it was undisputed that Jardine's work in the Mecham Matter, billed at his hourly rate, would have been worth $13,698.78. *Id.* ¶¶ 45–46. Furthermore, this court noted Jardine had obtained several favorable outcomes on behalf of Ms. Mecham. *Id.* ¶ 45. Thus, this court held that his $10,000 fee was not excessive. *Id.* ¶ 46. Accordingly, Jardine had not violated rule 1.5. *Id.*

¶33 This court affirmed, however, the district court's holding that Jardine had violated rule 1.15. *Id.* ¶ 53. This court also rejected Jardine's argument that he was entitled to safe harbor from prosecution for this violation under Opinion 136. *Id.*[10]

¶34 Before this court, Jardine "contend[ed] that his actions were consistent with the statement in Opinion 136 that a nonrefundable retainer, or a part of one, 'is considered earned upon payment, [and] it may be deposited into the attorney's general operating account

_____

(Communication); rule 1.4(b) (Communication); rule 1.5(a) (Fees); rule 1.6(a) (Confidentiality); rule 1.15(a), (c) and (d) (Safekeeping Property); rule 1.16(d) (Declining or Terminating Representation); rule 8.4(d) (Misconduct). *See Jardine*, 2012 UT 67, ¶¶ 10, 17, 19, 22.

[9] The parties also agreed that this non-refundable retainer "may be refunded if attorney materially breaches this agreement." *Id.*

[10] Jardine also argued that, as a matter of public policy, his flat fee contracts were desirable. *Jardine*, 2012 UT 67, ¶ 49. This court found his policy arguments "irrelevant." *Id.* The relevant issue, according to the court, was "simply whether he violated rule 1.15." *Id.*

rather than in his [or her] trust account.'" *Id.* ¶ 49 (alterations in original).

¶35 This court acknowledged that Opinion 136 provided some support for Jardine's argument. *See id.* ¶¶ 50–52. We focused on a passage in Opinion 136 discussing three requirements for charging a "nonrefundable retainer":

> The sentence in particular that best supports Mr. Jardine's position states that, when a fixed-fee agreement is permissible, it should "clearly set forth (a) what portion of the retainer is considered to be nonrefundable, (b) that nonrefundability is conditioned on the absence of default by the lawyer, and (c) what circumstances may entitle the client to a disgorgement of all or part of the 'nonrefundable' amount."

*Id.* ¶ 52 (quoting *Utah State Bar Ethics Advisory Op. 136*, 1993 WL 755253).

¶36 But what one hand giveth, the other taketh away. Although we acknowledged that Opinion 136 could be read to support Jardine's argument, we rejected that reading. We concluded:

> The weakness in Mr. Jardine's argument is that the guidelines of Opinion 136 support, not supplant, the fundamental requirement that the money must be earned before it is withdrawn. Mr. Jardine has not provided us with any reason to believe that the . . . Mecham Matter [was] of the type that would cause money to be earned upon receipt. He has not demonstrated that he provided a substantial benefit for his client by virtue of having a "towering reputation," that his commitment to be available had value in and of itself beyond the usual attorney/client relationship, that his acceptance of the matters disqualified him from accepting other matters, or any similar exception to the general rule. . . . We therefore conclude that, his Attorney-Client Fee Contract notwithstanding, Mr. Jardine had not earned the money before he deposited it into his operating account.

*Id.* ¶ 53.[11]

_____

[11] By way of reminder, the language quoted from Opinion 136 in this passage discusses when a nonrefundable fee could be considered reasonable. *See Op. 136*, 1993 WL 755253, at *2. Opinion 136 did not

(continued . . .)

¶37 We therefore found that a client's consent was not sufficient to create an "exception to the general rule" that a fee must be earned before it is deposited into an attorney's operating account. *Id.* Even though Jardine's agreement indicated that his retainer was "earned at the moment Client signs this contract" and that "[t]he parties agree that **THIS RETAINER IS NON-REFUNDABLE**," consent alone did not permit Jardine to earn those fees. *See id.* ¶¶ 12, 53.

¶38 Rather, we held that "money must be earned before it is withdrawn" from a trust account by providing a "substantial benefit" for a client. *Id.* ¶ 53. Jardine had "not demonstrated that he provided a substantial benefit for his client" before he treated his client's money as earned, so he violated rule 1.15. *Id.*

¶39 We also rejected Jardine's argument that he was entitled to safe harbor. Under the Safe Harbor Rule in effect at that time, the OPC could not prosecute an attorney if an ethics opinion "expressly approved" her conduct. *Id.* ¶ 40 (citation omitted). Applying this standard, we found nothing in Opinion 136 that "expressly approved" Jardine's conduct. *See id.* ¶¶ 49, 53. Rather, we found "the guidelines of Opinion 136 support, not supplant, the fundamental requirement that [a client's] money must be earned before it is withdrawn." *Id.* ¶ 53. And we upheld the district court's conclusion that Jardine violated rule 1.15. *Id.*

¶40 Thus, *Jardine* stands for the proposition that—in order to establish that a fee is earned when paid—an attorney must show that he or she provides some "substantial benefit" to the client *beyond* future legal services. *See id.* ¶ 53. If there is no such "substantial benefit," then an attorney's fee cannot be "earned before it is withdrawn." *Id.*

*D. Opinion 12-02*

¶41 After *Jardine*, the EAOC issued an advisory opinion answering the question: "What are the ethical and practical considerations applicable to attorneys representing clients in the state of Utah under flat-fee or fixed-fee agreements (hereinafter referred to as flat-fee agreements)?" *Utah State Bar Ethics Advisory Op. 12-02*, 2012 WL 8416318, at *1.

¶42 Opinion 12-02 first reaffirmed that "permissibility of flat-fee agreements in Utah is well established, subject always to the requirements of the Utah Rules of Professional Conduct." *Id.* Opinion 12-02 next explained the "ethical . . . considerations applicable to

_____

interpret rule 1.15 explicitly, but we nevertheless horked language from rule 1.5 and imported it into our rule 1.15 analysis in *Jardine*.

attorneys representing clients in the state of Utah under flat-fee or fixed-fee agreements." *Id.; see id.* at *2–5.

¶43 The opinion noted that the "question of where the attorney must deposit the flat fee largely turns on when the fee is earned." *Id.* at *4. "When the flat fee is earned depends primarily on the contractual arrangement between the attorney and client, subject to the rules of professional conduct." *Id.* at *3 (citing *Ryan v. Butera, Beausang, Cohen and Brennan*, 193 F.3d 210, 214 (3d Cir. 1999)).

¶44 Flat fee agreements must therefore explain *when* the flat fees are to be earned and *why* those fees are reasonable under rule 1.5. *See id.* at *4. "If there are particular circumstances which render a flat fee (or portion thereof) reasonably earned at any time prior to the termination of the representation, the attorney should clearly explain such circumstances in the fee agreement, especially with regard to the factors indicated in Rule 1.5(a)." *Id.* Furthermore, there is "no such thing as a nonrefundable fee." *Id.* at *3. "It is well established that clients are entitled to a refund of unearned or unreasonable fees, regardless of language used in a fee agreement." *Id.*

¶45 Consistent with this court's holding in *Jardine*, Opinion 12-02 cautioned against agreements that deposit the majority of a fee directly into an operating account: "The committee notes that the practice of designating the majority of a flat fee as earned at the outset of the representation may be unreasonable, given that the attorney has not yet performed any of the services contracted for in the fee agreement." *Id.* at *5.

¶46 In a footnote, Opinion 12-02 specifically addressed the very limited circumstances when an entire attorney fee could be earned before work is performed:

> In certain cases, it may be reasonable for a client to give informed consent to allow the entire flat fee to be earned upon commencement of the representation in order to protect the client's ability to secure counsel. Adding such a provision to a fee agreement may benefit the client where government seizure of the client's funds is reasonably believed to be imminent. In such a case, the fee agreement should be drafted so as to clearly explain in plain language terms the risks of designating the fee as earned immediately upon receipt, and describe the benefits to the client of doing so given the facts of the client's particular case. In other words, even in such circumstances, the fee must comply with Utah Rules of Professional Conduct Rule 1.5.

*Id.* at \*4 n.5 (citation omitted). Thus, a fee must *always* be reasonable at the time that it is purportedly earned. Only extraordinary circumstances would justify deeming an entire fee to be earned prior to the beginning of legal work. And those extraordinary circumstances must benefit the client, not the attorney. *See id.* at \*4–5.[12]

## II. BOWEN'S ARGUMENTS ON APPEAL

¶47 The district court concluded that Bowen's agreements violate rule 1.15. Applying *Utah State Bar v. Jardine* (*In re Discipline of Jardine*), 2012 UT 67, 289 P.3d 516, the district court found that Bowen could not treat his client's flat fee as earned when paid just because the client had consented to the arrangement.

¶48 Quoting *Jardine*, the district court reasoned that a lawyer must show some "substantial benefit" to her client to immediately claim the fee. The district court listed all of the possible "substantial benefit[s]" *Jardine* described—a "towering reputation," a "commitment to be available" that provides "value in and of itself beyond the usual attorney/client relationship," acceptance of matters leading to disqualification, or "*any similar exception to the general rule.*"

---

[12] In Opinion 12-02, the EAOC succinctly explains why our rules prefer that client funds be kept in trust accounts:

> Keeping the unearned portion of the fee in trust provides some protection for client funds from the attorney's creditors. Moreover, maintaining unearned fees in the client trust account assures that client property will be available for repayment in the event that the attorney is not able to complete the representation to an extent that would entitle the attorney to retain the entire fee.

*Utah State Bar Ethics Advisory Op. 12-02*, 2012 WL 8416318, at \*4 (footnote omitted).

The EAOC also corrected a misunderstanding that emerged from Opinion 136. Opinion 12-02 explained: "Language in a fee agreement which states, without further explanation, that a flat fee or other advance payment retainer is nonrefundable is a misrepresentation." *Id.* at \*4. In other words, attorneys should not claim in one breath to earn a "nonrefundable retainer" and then, in the next, explain the conditions for a refund of said "nonrefundable retainer." "To the extent that Utah State Bar Ethics Advisory Opinion No. 136 suggests otherwise, it is hereby superseded by the instant opinion." *Id.*

The district court found that Jardine satisfied none of these exceptions and therefore was not entitled to summary judgment.

¶49 The district court also rejected Bowen's argument that he could find safe harbor from prosecution in Opinion 136. Bowen argued that "he has complied with [Opinion 136] by including in the Subject Agreements an explanation that the fees were earned upon receipt" and the Opinion's other client consent requirements. The district court concluded that "the Utah Supreme Court squarely rejected the interpretation urged by [Bowen], specifically noting that 'the guidelines of Opinion 136 support, not supplant, the fundamental requirement that the money must be earned before it is withdrawn.'" (quoting *Jardine*, 2012 UT 67, ¶ 53). Based on that reading of *Jardine,* the district court rejected Bowen's attempt to find safe harbor.

¶50 Bowen asks us to reverse the district court for two reasons. Bowen first asks this court to find that he is entitled to safe harbor from OPC prosecution. If that path is unavailable to him, Bowen next asks this court to overrule *Jardine* to the extent that it "holds that client informed consent is irrelevant to when a fee is earned."

### A. Bowen is Entitled to Safe Harbor for the Brinson Contract, but not the Battaglia and Johnson Contracts

¶51 Bowen argues he is entitled to safe harbor from OPC prosecution under the Safe Harbor Rule of the Utah Rule of Professional Practice. *See* SUP. CT. R. PRO. PRAC. 14-504(d) (2019), *amended by and renumbered as* 11-522 (2020).[13] Under that Rule, the "OPC shall not prosecute a Utah lawyer for conduct that is in compliance with an ethics advisory opinion that has not been withdrawn at the time of the conduct in question." *Id.* So, for Bowen to establish that he is entitled to safe harbor, he must show that—at the time he formed a contract—he was "in compliance" with an ethics opinion that was still in effect at the time of his conduct.

¶52 To support his bid for safe harbor, Bowen points to the second sentence of Opinion 136 which explains that "[u]nder appropriate conditions, a nonrefundable retainer may be considered earned when paid and, therefore, may be deposited into the attorney's

_____

[13] As noted above, the Safe Harbor Rule was—until December 2020—housed in Utah Rule of Professional Practice 14-504(d). It has made the move from chapter 14 to chapter 11 and now lives at rule 11-522. We will continue to refer to the Safe Harbor Rule as rule 14-504(d), though, because that version of the Safe Harbor Rule was in effect when the district court ruled on summary judgment and is the one referenced in its decision.

operating account." *Utah State Bar Ethics Advisory Op. 136*, 1993 WL 755253, at *1. He reads this sentence to establish that there are at least some "appropriate conditions" when a retainer can be earned when paid.

¶53 Bowen finds those "appropriate conditions" at the end of Opinion 136. There, Opinion 136 lists three conditions required to establish that a fee was "earned when paid": the contract must "clearly set forth (a) what portion of the retainer is considered to be nonrefundable, (b) that nonrefundability is conditioned on the absence of default by the lawyer, and (c) what circumstances may entitle the client to a disgorgement of all or part of the 'nonrefundable' amount." *Id.* at *3.

¶54 Bowen argues that these are the "appropriate conditions" discussed at the beginning of the opinion. He describes these criteria as creating a standard for "client informed consent" or "written informed consent." Bowen argues that, if a client gives "written informed consent," an attorney can deposit the client's funds into his or her operating account.

¶55 Bowen argues that he satisfied the "client informed consent" requirement and thus met the "appropriate conditions." Bowen "informed" his clients in their written agreements: (a) that all of his fee was "immediate compensation," (or a "nonrefundable retainer" in Opinion 136's terminology); (b) that the fee was conditional on his performance; and (c) that any unearned portion of the fee could be refunded pursuant to the Utah Rules of Professional Conduct. Bowen's clients signed and consented to those terms. Bowen therefore claims he complied with Opinion 136.

¶56 The hurdle Bowen faces is that we rejected a very similar, if not identical argument, in *Jardine*. There, this court clarified that Opinion 136's discussion of client consent does not support the conclusion that consent alone is sufficient to treat a fee as "earned upon receipt." *See Jardine*, 2012 UT 67, ¶¶ 52–53. We held, "the guidelines of Opinion 136 support, not supplant, the fundamental requirement that [a client's] money must be earned before it is withdrawn." *Id.* ¶ 53. A lawyer must show a "substantial benefit" to the client for "money to be earned upon receipt." *Id.* A lawyer can show "a substantial benefit for [the] client by virtue of having a 'towering reputation,' that [the lawyer's] commitment to be available had value in and of itself beyond the usual attorney/client relationship, that [the lawyer's] acceptance of the matters disqualified him [or her] from accepting other matters, or any similar exception to the general rule." *Id.*

¶57 By way of reminder, Bowen entered into the 2011 Brinson contract prior to our October 2012 issuance of *Jardine,* and signed the December 2012 Battaglia and Johnson contracts after. *See supra* ¶¶4, ¶6, ¶14. This timing matters. To find safe harbor, Bowen needs to show that he acted "in compliance" with an ethics opinion. *See* SUP. CT. R. PRO. PRAC. 14-504(d) (effective Nov. 1, 2012), *renumbered as and amended by* 11-522(a) (effective Dec. 15, 2020). But Bowen only complied with Opinion 136 if we afford it an interpretation that we rejected in *Jardine.* Stated differently, Bowen cannot contort himself into compliance by relying on an interpretation of Opinion 136 that we have discredited.[14] This means that Bowen is not entitled to avail himself of the Safe Harbor Rule for the Battaglia and Johnson

_____

[14] Bowen also argues that he was entitled to rely on his reading of Opinion 136 because, under the Safe Harbor Rule, "Mr. Bowen was not obligated to discover possible interpretations of Opinion 136 and act accordingly." There is a glaring problem with Bowen's argument. Ethics opinions are not binding on courts; but for better or worse, our decisions are binding on the EAOC, OPC, and Bowen. *See* SUP. CT. R. PRO. PRAC. 11-522(a) ("No court is bound by an ethics opinion's interpretation of the Rules of Professional Conduct. . . ."). If we issue an opinion that contradicts an advisory opinion, the opinion has been effectively withdrawn. As such, he may not have been obligated to conform his behavior to all possible interpretations of Opinion 136, but he was obligated to follow ours.

The Chief Justice and Associate Chief Justice push back on this conclusion. Justice Lee opines that an ethics opinion is not "withdrawn" until it has been formally withdrawn or expressly repudiated. *Infra* ¶ 111. The Chief Justice recognizes that our interpretation "might very well be the best one," but argues that it would be unfair to impose that interpretation on Bowen because he had no notice that he needed to look "beyond the text of the ethics advisory opinion" to decide whether it had been withdrawn. *Infra* ¶ 91.

We respect both of those takes, and recognize that it would have been better if the Bar had adopted a formal process to withdraw ethics opinions that conflict with our opinions. That having been said, and at the risk of sounding a tad imperial, it does not seem to be that big a lift to ask attorneys who have a question about a rule of professional conduct to review our case law to see if we have spoken about the rule. Nor is it too much to ask that they understand that if our interpretation clashes with that in an ethics advisory opinion, our interpretation controls.

(continued . . .)

contracts, and the district court correctly rejected summary judgment on that claim.

¶58 The Brinson contract is different. Bowen entered into his agreement with Brinson prior to *Jardine*, *see supra* ¶¶4, ¶14, and would not have had the benefit of our interpretation when he asked Brinson to consent to him earning the retainer when it was paid. Because of this, Bowen is entitled to the benefit of the Safe Harbor Rule, and the district court erred in denying Bowen summary judgment on this claim.

¶59 A sharp-eyed reader may note some dissonance in this conclusion and ask herself: Why is Bowen entitled to safe harbor when Jardine was not? After all, we had not rejected the argument Jardine made on appeal when we denied him benefit of safe harbor. The answer comes from a change to the Safe Harbor Rule.

¶60 When we issued *Jardine*, the Safe Harbor Rule required that an attorney's conduct be "expressly approved" by an ethics opinion to merit safe harbor. SUP. CT. R. PRO. PRAC. 14-504(d) (March 5, 2012). One month after our issuance of *Jardine*, the Safe Harbor Rule was amended to require that an attorney's conduct be "in compliance" with an ethics opinion. SUP. CT. R. PRO. PRAC. 14-504(d) (Nov. 1, 2012).[15]

¶61 This shift in the Safe Harbor Rule's language following *Jardine* made the safe harbor slightly broader. Indeed, that is the way we represented the change in the rule to the public. In our public comment notice for the proposed rule change, we indicated that "[t]he amendment [to the Safe Harbor Rule] proposes a slightly broader safe harbor for attorneys who rely on ethics advisory opinions." Letter from Ms. Katherine A. Fox, General Counsel, Utah St. Bar, to Ms. Patricia H. Bartholomew, Clerk of Court, Utah Sup. Ct. (February 23, 2012) (on file with the Utah Supreme Court). We appear to have borrowed the "slightly broader" description from a letter the chair of

_____

[15] The version of the Safe Harbor Rule we apply is the version in effect when the OPC began its prosecution. We apply "the law as it exists at the time of the event regulated by the law in question." *State v. Clark*, 2011 UT 23, ¶ 13, 251 P.3d 829. The law at the time the OPC initiated its prosecution of Bowen provided that the "OPC shall not prosecute a Utah lawyer for conduct that is in compliance with an ethics advisory opinion that has not been withdrawn at the time of the conduct in question." SUP. CT. R. PRO. PRAC. 14-504(d) (2019), *amended by and renumbered as* 11-522 (2020).

(continued . . .)

our Advisory Committee on the Rules of Professional Conduct sent to us. Letter from Mr. Steven G. Johnson, Chair, Advisory Comm. on the Rules of Prof. Conduct, to Chief Justice Matthew B. Durrant, Utah Sup. Ct. (August 29, 2012) (on file with the Utah Supreme Court). In that letter, he wrote that the Committee proposed "a slightly broader Safe Harbor Rule for attorneys." *Id.* We agree that the Safe Harbor Rule became slightly broader in the amendments issued after *Jardine*. As such, we analyze Bowen's ability to find safe harbor on the Brinson contract under a more forgiving standard than the one that Jardine faced, and reach a different conclusion.[16]

¶62 By jettisoning the "expressly approved" standard for a standard of "compliance," we opened the door to safe harbor when an ethics opinion implicitly sanctions the attorney's conduct. Implicit approval requires only that the ethics advisory opinion could be reasonably read to endorse the lawyer's conduct. If the opinion expressly prohibits the lawyer's conduct, safe harbor would, of course, be inappropriate.[17]

_____

[16] Bowen argues that we ought to reverse the district court with regard to all of his challenged conduct because *Jardine* "is distinguishable" from his case. As discussed, we agree the new Safe Harbor Rule establishes a broader safe harbor than the rule in *Jardine*. So it is distinguishable. But the change in the Safe Harbor Rule only means that *Jardine* does not control our decision with regard to Bowen's pre-*Jardine* conduct. This change does not justify or require reversing the district court entirely.

[17] Justice Lee disagrees with this reading of the rule. Justice Lee asserts that "it is not enough for an attorney to show that he [or she] has a reasonable but incorrect view of the operative legal standard." *Infra* ¶ 108. He allows that the interpretation need not be "set forth *expressly*" in the relevant rule or opinion, but he thinks that the interpretation the attorney gives the ethics opinion cannot be "incorrect." *Infra* ¶ 119.

We agree up to a point. If the attorney is on actual or constructive notice that her interpretation is incorrect, then that attorney cannot find safe harbor in a mistaken belief about what that ethics opinion requires. For example, here, Bowen was not entitled to persist in his incorrect interpretation of Opinion 136 after this court ruled in *Jardine*. Nor would he be entitled to safe harbor based on an argument that he was unaware of *Jardine*.

But we break with Justice Lee when we consider what we should do with an ethics opinion that is susceptible to two reasonable

(continued . . .)

¶63 Opinion 136 can be reasonably read to endorse Bowen's actions. As previously discussed, the Opinion states that there are "appropriate conditions" for treating client funds as "earned when paid" such that the funds could be "deposited into the attorney's operating account." *Op. 136*, 1993 WL 755253, at *1. Later, the Opinion lists three conditions required to establish that a fee was "earned when paid": "(a) what portion of the retainer is considered to be nonrefundable, (b) that nonrefundability is conditioned on the absence of default by the lawyer, and (c) what circumstances may entitle the client to a disgorgement of all or part of the 'nonrefundable' amount." *Id.* at *3. And, as discussed above, *supra* ¶55, Bowen satisfied these three conditions in his Brinson contract.[18] Bowen contracted with Brinson for a fee that would be treated as "immediate compensation" and "deposited into [his] general operating account." He pledged that, "[i]n the event that the project is not completed for any reason, any unearned fees will be refunded to you in accordance with the Utah Rules of Professional Conduct."

¶64 Opinion 136 does not tell the reader whether these listed conditions are all of the "appropriate conditions" referenced at the beginning of the Opinion. Based on the structure of the Opinion and the absence of any explicit contradictory language, a reasonable attorney could have read the Opinion the way Bowen did. A reasonable attorney could have believed that he could treat a fee as earned when paid if he obtained informed client consent.

¶65 Justice Lee reaches a contrary conclusion because he contends that "Bowen has not identified *any* basis in Opinion 136 — explicit or implicit — for concluding that his fees were earned when paid." *Infra* ¶ 124. That is not entirely correct. Bowen asserts that Opinion 136 allowed him to obtain client consent to treat the fees as earned when paid. We acknowledge that, as Justice Lee argues, this court held that informed client consent is not actually sufficient to treat a fee as

_____

interpretations. We believe the better policy, and the one that best fulfills a safe harbor's reason to be, can be found in a rule that does not permit the OPC to prosecute someone who attempts in good faith to comply with an ethics opinion. And we believe that should hold true even if that attorney is ultimately, but reasonably, mistaken about what that ethics opinion requires.

[18] Justice Lee discounts Bowen's ability to rely on this language, arguing that Bowen quotes it out of context. *Infra* ¶ 120. The context, however, comes mostly from *Jardine*. We can envision how, without the context *Jardine* provides, a reasonable attorney could read those conditions the way Bowen did.

earned when paid. After *Jardine,* an attorney needs to show that she has conferred some benefit to the client before she can treat a fee as earned when paid. *Infra* ¶ 110; *Jardine*, 2012 UT 67, ¶ 53.

¶66  But we do not think that this was the only reasonable reading of Opinion 136 before *Jardine*. The Opinion discusses the potential benefits an attorney might confer on a client before she bills a single minute—a "towering reputation" and such. That discussion came into the Opinion through a quotation from the Florida Court of Appeals, *Bain v. Weiffenbach*. *Op. 136*, 1993 WL 755253, at *2 (quoting *Bain v. Weiffenbach*, 590 So.2d 544 (Fla. App. 1991)). The portion of *Weiffenbach* that Opinion 136 cites addresses whether it was reasonable for a lawyer to have "refused to *refund* any of [a] 'nonrefundable retainer'" after taking a fee and failing to perform any work for a client. *Id.* (emphasis added) (quoting *Weiffenbach*, 590 So.2d 544, 545). The Florida Court of Appeals explained that it could be reasonable not to *refund* a fee if a lawyer provided a "substantial benefit for the client." *Id.* (quoting *Weiffenbach*, 590 So.2d 544, 545).

¶67  That is likely why Bowen's agreement explicitly discussed the possibility that, "[i]n the event that the project is not completed for any reason, any unearned fees will be *refunded* to you in accordance with the Utah Rules of Professional Conduct." (Emphasis added). It appears that Bowen believed, based upon his reading of the Opinion, that he would only need to show a "benefit" to the client when calculating this refund. We later clarified in *Jardine* that a lawyer must show a benefit to his or her client not just when assessing the reasonableness of a refund, but also *before* a lawyer takes a client fee and deposits it into his or her operating account. 2012 UT 67, ¶ 53. As such, we disagree with Justice Lee that "Bowen has not identified *any* basis in Opinion 136—explicit or implicit—for concluding that his fees were earned when paid." *Infra* ¶ 124. Bowen complied with a reading of the Opinion that was reasonable prior to *Jardine*.

¶68  Because we hold that the undisputed facts before the district court demonstrate that Bowen attempted to comply with a reading of Opinion 136 that—prior to *Jardine*—was reasonable, under the revised safe harbor standard, Bowen cannot be prosecuted for the Brinson contract.

¶69  After *Jardine* though, his reading of Opinion 136 was no longer reasonable. To the extent that Opinion 136 endorsed this reading, it was effectively withdrawn. *See supra* ¶57 n.14. Bowen is not entitled to summary judgment for conduct based on the post-*Jardine* Battaglia and Johnson contracts.

### B. We Reject Bowen's Invitation to Overrule Jardine

¶70 Bowen next argues that we should overrule *Jardine*. Bowen sets himself on a difficult path. In *Eldridge v. Johndrow*, we explained,

> Stare decisis "is a cornerstone of Anglo–American jurisprudence" because it "is crucial to the predictability of the law and the fairness of adjudication." Because stare decisis is so important to the predictability and fairness of a common law system, we do not overrule our precedents "lightly."

> However, our presumption against overruling precedent is not equally strong in all cases. Our decisions have identified two broad factors that distinguish between weighty precedents and less weighty ones: (1) the persuasiveness of the authority and reasoning on which the precedent was originally based, and (2) how firmly the precedent has become established in the law since it was handed down.

2015 UT 21, ¶¶ 21-22, 345 P.3d 553 (citations omitted). Therefore, Bowen must demonstrate that both of these factors favor overruling *Jardine*.

¶71 Bowen makes three arguments. First, Bowen argues that *Jardine* is "unpersuasive" and "based on faulty reasoning" because it conflicts with Opinion 136 and Opinion 12-02. Second, he argues that that *Jardine's* approach conflicts with other legal principles. Third, he argues that policy disfavors keeping *Jardine*, as the opinion "does not work well in practice and would cause more hardship if it were to stay in place than if it were overruled."

¶72 Bowen first argues that *Jardine* should be overruled because it is in tension with Opinion 136 and Opinion 12-02. He argues that "Opinion 136 does not state that the flat fee agreement is *only* earned in certain contexts—such as where the matter is 'of the type that would cause money to be earned upon receipt.'" Instead, Bowen reads Opinion 136 as "allow[ing] the client's informed consent to resolve any ambiguity in the question of when a fee is earned." He argues that Opinion 12-02 is also consistent with this reading.

¶73 We disagree that *Jardine* is "unpersuasive" or "based on faulty reasoning" because it could be read to conflict with Opinion 136 or Opinion 12-02. As we noted above, we are not bound by EAOC's ethics opinions. *See* SUP. CT. R. PRO. PRAC. 11-522(a). Thus, when our holdings diverge from non-binding ethics opinions, we do not create tension, we resolve it.

¶74 Regardless, we read Opinion 136 and Opinion 12-02 as consistent with *Jardine*. Opinion 136 states that under "appropriate conditions, a nonrefundable retainer may be considered earned when paid and, therefore, may be deposited into the attorney's operating account rather than his [or her] trust account." *Utah State Bar Ethics Advisory Op. 136*, 1993 WL 755253, at *1.

¶75 In *Jardine*, this court listed a number of the "appropriate conditions" that would permit an attorney to treat a fee as earned when paid, and place it into her operating account. 2012 UT 67, ¶ 50. This court tied the question of when an initial fee may be immediately deposited to whether a fee is reasonable under rule 1.5. *See id.* ¶¶ 42, 50–53. To deposit the fee upon payment, the attorney must demonstrate that she reasonably earned it. Opinion 136 outlines a number of circumstances when an attorney could earn a reasonable fee before working on the matter. In *Jardine,* we borrowed those examples. We explained that, for a fee to be reasonably earned, rule 1.5 requires the lawyer to demonstrate,

> [S]ubstantial benefit for his [or her] client by virtue of having a "towering reputation," that his [or her] commitment to be available had value in and of itself beyond the usual attorney/client relationship, that his [or her] acceptance of the matters disqualified him [or her] from accepting other matters, or any similar exception to the general rule.

*Id.* ¶ 53. As such, *Jardine* represents our interpretation of rules 1.5 and 1.15 and can be read as our gloss on Opinion 136.

¶76 Bowen additionally claims that Opinion 12-02 is inconsistent with *Jardine* because the Opinion "expressly states that flat fees can be deemed earned when paid." Bowen points to this line from Opinion 12-02 to bolster his interpretation: "When the flat fee is earned depends primarily on the contractual arrangement between the attorney and client, subject to the rules of professional conduct." *Utah State Bar Ethics Advisory Op. 12-02*, 2012 WL 8416318, at *3.

¶77 But Opinion 12-02 does not "expressly state" that fees can be "earned when paid" based only on client consent. The opinion states that when a fee is earned depends "primarily" — not only — on a contractual agreement. Furthermore, the opinion also says that these written agreements must be "subject to the rules of professional conduct." Those rules, as clarified in *Jardine*, permit fees to be "earned when paid" *only* when a "substantial benefit" is conferred to the client. *Jardine*, 2012 UT 67, ¶ 53. So, Opinion 12-02 does not "expressly state" that client consent is the only thing that matters for treating a fee as "earned when paid." Rather, the Opinion reaffirms *Jardine's* rule:

Client consent is required for treating a fee as "earned when paid," but so is a "substantial benefit" to the client. *See id.* ¶¶ 52–53.

¶78 The rest of Opinion 12-02 is consistent with *Jardine* as well. Echoing the key holding from *Jardine* quoted above, *infra* ¶36, Opinion 12-02 explains that, "[i]f there are particular circumstances which render a flat-fee (or portion thereof) reasonably earned at any time prior to the termination of the representation, the attorney should clearly explain such circumstances in the fee agreement, especially with regard to the factors indicated in Rule 1.5(a)." *Op. 12-02*, 2012 WL 8416318, at *4. Consistent with *Jardine*, Opinion 12-02 explains that "the practice of designating the majority of a flat fee as earned at the outset of the representation may be unreasonable, given that the attorney has not yet performed any of the services contracted for in the fee agreement." *Id.* at *5. Opinion 12-02 only describes one extreme edge case where it might be reasonable for a lawyer to deposit an entire fee on receipt. *See id.* at *1, *4 n.5 (describing a case where a client would want a lawyer to treat a fee as earned on payment because creditors are attempting to obtain the client's assets). None of this conflicts with *Jardine*.

¶79 Thus, we conclude there is no tension between *Jardine* and either Opinion 136 or Opinion 12-02. And there is no reason to overturn *Jardine* to resolve it.

¶80 Second, Bowen argues that *Jardine* is "is not consistent 'with other legal principles'" because it conflates rule 1.15 with rule 1.5. Bowen posits that the "court does not need two rules for the same violation." We understand Bowen's complaint that *Jardine*, by looking to whether fees were reasonable under rule 1.5 to decide whether a fee was earned under 1.15, tightly braided rules 1.5 and 1.15 together. But they nevertheless remain separate rules that govern separate conduct. In both *Jardine* and this case, rule 1.15 was violated, rule 1.5 was not. Although they are intertwined, they sanction different conduct and are supported by different policy considerations. Bowen correctly notes that in *Jardine*, we borrowed the language and reasoning of rule 1.5 to give meaning to rule 1.15. But this did not, as Bowen complains, blend the rules into an unpalatable mélange.

¶81 Third, Bowen argues that *Jardine* promotes bad policy and "would cause more hardship if it were to stay in place than if it were overruled." He argues that, under *Jardine*, "client consent plays no role" in determining "when a fee can be deemed earned under a flat fee agreement." He reasons that allowing client consent to dictate when a fee can be earned will produce better outcomes. We have two responses.

¶82 First, under *Jardine*, client consent *does* play a role in determining when a fee may be earned. *Jardine* left in place the client consent requirements Opinion 136 outlines. *See Jardine*, 2012 UT 67, ¶ 52. And then *Jardine* clarified that a "substantial benefit" to the client is required, *in addition to consent*, to treat a fee as "earned upon receipt." *Id.* ¶ 53.

¶83 Second, we disagree with Bowen's view that using client consent alone to determine when a fee can be earned would necessarily be more desirable. Bowen argues that client consent solves an otherwise insurmountable challenge for attorneys: determining where client funds must be kept. He writes,

> In essence, *Jardine* forces an attorney to evaluate whether or not they have a "towering reputation" sufficient to justify their depositing the flat fee into their operating account at the outset of representation. And if they are wrong, the likely discipline is disbarment for violation of rule 1.15. This "test" is unworkable.

Although we have some sympathy for Bowen's claim that a brighter line would be easier to administer, we ultimately see the bug that Bowen identifies as a feature. If a lawyer cannot be certain that he or she is providing an additional "substantial benefit" to his or her client that justifies treating a fee as "earned when paid" then the lawyer should not treat the fee as "earned when paid." The lawyer would be receiving a benefit—immediate compensation—without having earned it. We can understand why many attorneys would appreciate the opportunity to immediately deposit retainers into their operating accounts, but we are currently persuaded that the client protection benefits of the current system outweigh the potential benefits to attorneys.[19]

¶84 We decline Bowen's invitation to overrule *Jardine*.[20]

---

[19] Of course, if Bowen, or other members of the Bar, would like to initiate an in-depth exploration of the competing policies with an eye towards changing the rules, they are welcome to bring the matter to the Supreme Court's Advisory Committee on the Rules of Professional Conduct. There, the committee can evaluate the pros and cons of a rule change outside the context of a violation of the existing rule.

[20] As one of the *Eldridge* factors is not met, we need not discuss the other. *Eldridge*, 2015 UT 21, ¶¶ 21–22; *see also supra* ¶70.

## CONCLUSION

¶85 Although we conclude that the "earned when paid" provisions of Bowen's retainer agreements violate the Utah Rules of Professional Conduct, Bowen is entitled to safe harbor from prosecution for the Brinson contract. We therefore reverse and remand to the district court with instructions to enter summary judgment for Bowen on claims related to this contract. We affirm the district court's denial of summary judgment on the Battaglia and Johnson contracts. For the claims premised on those contracts, Bowen is not entitled to summary judgment. We remand for further proceedings.

————

DURRANT, C.J., concurring in part and dissenting in part

CHIEF JUSTICE DURRANT, concurring in part and dissenting in part:

¶86    I concur with the majority's conclusion that Mr. Bowen's practices violated rule 1.15(c). I also agree that Opinion 136 can be reasonably read to suggest that an attorney may classify a client payment as a "fixed fee" or "nonrefundable retainer," allowing him to deposit the payment directly into his operating account. But I disagree with the majority's view that only one of Mr. Bowen's fee arrangements falls within the protection of the Safe Harbor Rule. The text of the rule provided Mr. Bowen no notice that he was required to look beyond Opinion 136 to determine whether one of its reasonable interpretations had been effectively withdrawn by our case law. Accordingly, I would apply the rule of lenity in Mr. Bowen's favor and clarify the rule moving forward.

¶87    The Safe Harbor Rule prohibits the Office of Professional Conduct (OPC) from prosecuting an attorney for "conduct that is in compliance with an ethics advisory opinion" so long as that opinion "has not been withdrawn at the time of the conduct in question."[21] The majority concludes, and I agree, that "Opinion 136 can be reasonably read to endorse Bowen's actions."[22] "Based on the structure of the Opinion and the absence of any explicit contradictory language . . . [a] reasonable attorney could have believed that he could treat a fee as earned when paid if he obtained informed client consent."[23]

¶88    As the majority explains, in *Utah State Bar v. Jardine* (*In re Discipline of Jardine*), 2012 UT 67, 289 P.3d 516, we interpreted Opinion 136 in a way that is inconsistent with Mr. Bowen's reading. The majority therefore concludes that in *Jardine* we effectively withdrew the reading Mr. Bowen now advances. Accordingly, the majority holds that only Mr. Bowen's contracts predating *Jardine* fall within the protection of the Safe Harbor Rule.[24]

¶89    But in reaching this result, the majority inserts into the Safe Harbor Rule a requirement that attorneys who wish to rely upon an interpretation of our ethical rules that is permitted by an advisory opinion must confirm that we have not foreclosed that interpretation

---

[21] SUP. CT. R. PRO. PRAC. 14-504(d) (2019), *amended by and renumbered as* 11-522(a) (2020).

[22] *Supra* ¶ 63.

[23] *Supra* ¶ 64.

[24] *Supra* ¶¶ 57–58.

(continued . . .)

C.J. DURRANT, concurring in part and dissenting in part

in our case law. This is contrary to the language of the Safe Harbor Rule, which states that "[t]he OPC may not prosecute a Utah Lawyer for conduct that is in compliance with an ethics advisory opinion that *has not been withdrawn* . . . ."[25] The text of the rule does not elaborate on how Utah lawyers are to know when an advisory opinion has been "withdrawn." The majority relies on one possible interpretation of the rule to fill in the blank, declaring that "[i]f we issue an opinion that contradicts an advisory opinion, the opinion has been effectively withdrawn."[26] But that is not the only plausible interpretation.

¶90    Alternatively, the Safe Harbor Rule's use of "withdrawn" could refer to the Ethics Advisory Committee's issuance of an opinion formally withdrawing a previous opinion. Or we could, pursuant to our constitutional authority to regulate the practice of law, explicitly withdraw an advisory opinion in the resolution of an attorney discipline case. Regardless, we did not explicitly withdraw Opinion 136 in *Jardine*, we endorsed it, and it remains available to the public in its original form.[27]

¶91    Granted, the majority's interpretation of "withdrawn" is plausible and might very well be the best one. Certainly, a case can be made that a diligent attorney should look beyond an ethics advisory opinion, even if it has not been explicitly withdrawn, to ensure that it remains effective under our case law. But that seems to defeat the very notion of a safe harbor rule. The text of the Safe Harbor Rule provides no disclaimer that attorneys must look to the case law to determine whether we have "effectively" withdrawn an opinion. Nor does Opinion 136 provide any such disclaimer. So, from the text of the Safe Harbor Rule, Mr. Bowen had no notice that he must look beyond the text of the ethics advisory opinion to determine whether it had been "effectively" withdrawn in whole or in part. For this reason, I would, under the rule of lenity, hold that each of Mr. Bowen's contracts finds refuge within the Safe Harbor Rule.[28]

¶92    Although we have typically applied the rule of lenity only in criminal cases, the concerns motivating the rule are also present in

---

[25] SUP. CT. R. PRO. PRAC. 14-504(d) (2019) (emphasis added).

[26] *Supra* ¶ 57 n.14.

[27] *See In re Discipline of Jardine*, 2012 UT 67, ¶ 53; *Utah State Bar Ethics Advisory Op. 136*, 1993 WL 755253.

[28] *See State v. Rasabout*, 2015 UT 72, ¶ 22, 356 P.3d 1258 (2015) ("[W]e interpret an ambiguous statute in favor of lenity toward the person charged with . . . wrongdoing.").

(continued . . .)

DURRANT, C.J., concurring in part and dissenting in part

bar disciplinary cases.[29] We have held that lawyers are "entitled to procedural due process guarantees in disciplinary actions," including, "[a]t a minimum, 'timely and adequate notice . . . .'"[30] In the criminal context, this notice requirement "mandate[s] that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited."[31] So, under the rule of lenity, "we interpret an ambiguous statute in favor of lenity toward the person charged with criminal wrongdoing."[32]

¶93 Bowen has not been charged with criminal wrongdoing, but the consequences of this disciplinary action could be just as penal as those imposed in some criminal prosecutions.[33] So the due process

---

[29] *See In re Discipline of Haley*, 126 P.3d 1262, 1273 (Wash. 2006) (Sanders, J., concurring) ("While the Rules of Professional Conduct are only 'quasi-criminal,' . . . the rule of lenity applies to both criminal and quasi-criminal statutes." (citation omitted)); *see also In re Disciplinary Proceeding Against McGlothlen*, 663 P.2d 1330, 1334 (Wash. 1983) (stating that court rules like the particular Code of Professional Responsibility at issue "are subject to the same principles of construction as are statutes").

[30] *In re Discipline of Sonnenreich*, 2004 UT 3, ¶ 37, 86 P.3d 712 (alteration in original) (quoting *In re Worthen*, 926 P.2d 853, 876 (Utah 1996)); *see also In re Ruffalo*, 390 U.S. 544, 552 (1968) (holding that in a state disbarment proceeding "absence of fair notice as to the reach of the grievance procedure" violated attorney's due process rights).

[31] *Rasabout*, 2015 UT 72, ¶ 24 (quoting *Dunn v. United States*, 442 U.S. 100, 112 (1979)).

[32] *Id.* ¶ 22.

[33] *See Ruffalo*, 390 U.S. at 550 ("Disbarment, designed to protect the public, is a punishment or penalty imposed on the lawyer."); *Gay v. Virginia State Bar ex. rel. Second Dist. Comm.*, 389 S.E.2d 470, 474 (Va. 1990) (referring to attorney sanctions as "punishments").

In his dissent, Justice Lee questions the propriety of my proposed application of the rule of lenity on the basis that due process also requires timely and adequate notice in civil cases. That is certainly true, but disciplinary cases are more akin to criminal cases because the state government wields its power to punish an individual for prohibited conduct. And "[r]udimentary justice requires that those subject to the law must have the means of knowing what it prescribes." Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. CHI. L. REV. 1175, 1179 (1989) (noting "one of emperor Nero's nasty

(continued . . .)

analysis should be the same.[34] Bowen should have had adequate notice of what conduct would subject him to such sanctions.[35] The rule of lenity requires that the ambiguity in the Safe Harbor Rule be construed in Bowen's favor, and he should not be subject to sanctions.[36]

_____

practices was to post his edicts high on the columns so that they would be harder to read and easier to transgress").

[34] *See Haley*, 126 P.3d at 1274 (Sanders, J., concurring) ("Courts have long recognized that disbarment is 'penal in its nature' and subject to the rule of lenity." (citation omitted)).

[35] Our case law regarding the notice requirement in disciplinary proceedings has primarily dealt with adequate and timely notice of trial, which includes notice of the rules allegedly violated. *See, e.g.*, *Worthen*, 926 P.2d at 878 ("To meet minimum due process requirements, the [Judicial Conduct] Commission's notice of formal proceedings must set forth the applicable provisions of the Code of Judicial Conduct alleged to have been violated."). It is a small step from there to hold that the included rules must clearly state, or give notice of, what conduct is prohibited.

[36] Justice Lee argues that we are in no position to resolve the case in this way for two reasons. First, he argues that Bowen has not identified a basis for applying the rule of lenity to the Safe Harbor Rule. And second, he argues that the parties have not had an opportunity to be heard on the applicability of the rule of lenity in the disciplinary setting. While Justice Lee is correct that the parties do not address the applicability of the rule of lenity in their briefs, "we may, and often have, employed dictionaries, canons of construction, or other tools for statutory interpretation that have not been argued by the parties." *Rasabout*, 2015 UT 72, ¶ 37 (Durrant, C.J., concurring in part and concurring in the judgment). And "an overlooked or abandoned argument should not compel an erroneous result." *Kaiserman Assocs., Inc. v. Francis Town*, 977 P.2d 462, 464 (Utah 1998).

The rule of lenity is a "principle[] of statutory interpretation." *State v. Bradshaw*, 2006 UT 87, ¶ 10, 152 P.3d 288. And the parties have presented competing, plausible interpretations of the Safe Harbor Rule: Bowen argues that Opinion 136 has not been withdrawn; and the OPC argues that we foreclosed Bowen's interpretation of Opinion 136 in *Jardine*, necessarily implying that Bowen must look beyond the text of the opinion to know whether it has been partially withdrawn. *See Derbidge v. Mut. Protective Ins. Co.*, 963 P.2d 788, 791 (Utah Ct. App. 1998) ("'Ambiguous' means capable of 'two or more *plausible*

(continued . . .)

DURRANT, C.J., concurring in part and dissenting in part

¶94 My proposed outcome raises the question of whether the Safe Harbor Rule, as written, diminishes the precedential weight of our decision in *Jardine*. The majority touches on this problem, stating that "[n]o court is bound by an ethics opinion[]" and " our decisions are binding on the EAOC, OPC, and Bowen," so it must be true that Mr. Bowen was obligated to "follow *our*[]" interpretation of Opinion 136 presented in *Jardine*.[37] I agree that we are not bound by an ethics opinion. It is fully within our power to require that any ethics opinion be withdrawn, either in whole or in part. And absent the safe harbor rule, I would be in complete agreement with the majority that Mr. Bowen should be subject to prosecution under rule 1.15(c) for each of his post-*Jardine* contracts. But we, as a court, elected to provide a safe harbor for those who comply with the terms of an ethics opinion, so long as that opinion has not been withdrawn. In my view, to say that an ethical opinion provides safe harbor only to the extent it is consistent with our case law, misses the point of a safe harbor rule.

¶95 Going forward from today's opinion, attorneys will be on notice that the Safe Harbor Rule has no application to an otherwise acceptable interpretation of an ethics opinion that has been effectively foreclosed by an opinion from this court. But I believe it is unfair to hold Mr. Bowen accountable to this new limitation on the protection accorded by the Safe Harbor Rule.

--------

meanings.'" (quoting *Alf v. State Farm Fire & Cas. Co.*, 850 P.2d 1272, 1274 (Utah 1993))).

The Safe Harbor Rule's ambiguity is squarely before us, and the majority resolves it against Bowen. The only way to avoid interpreting the Safe Harbor Rule is to conclude, as Justice Lee has, that Bowen's interpretation of Opinion 136 is not supported by its text. Justice Lee has presented plausible reasons for so concluding, but I disagree. Because I also do not share Justice Lee's misgivings about the use of the interpretive tools I have employed, *see supra* ¶ 93 n.33, I present what I see as the correct resolution of this case.

[37] *Supra* ¶ 57 n.14 (emphasis added).

LEE, A.C.J., concurring in part and dissenting in part

ASSOCIATE CHIEF JUSTICE LEE, concurring in part and dissenting in part:

¶96 I agree with and concur in the court's decision to deny Mr. Bowen's motion for summary judgment on the charges arising from fee deposits into his operating account under the Battaglia and Johnson contracts. And I concur in much of the majority's analysis in support of that decision.

¶97 I respectfully disagree, however, with the court's analysis and disposition of the charge arising from the deposit made under the Brinson contract. I find no basis for the court's conclusion that this deposit is immune from prosecution under Ethics Advisory Opinion 136 and the "safe harbor" provision in amended rule 14-504(d). *See* SUP. CT. R. PRO. PRAC. 14-504(d) (2019), *amended by and renumbered as* 11-522 (2020).[38] The safe harbor rule provides that an attorney is immune from compliance where his conduct "is in compliance with an ethics advisory opinion that has not been withdrawn at the time of the conduct in question." *Id.* And Ethics Advisory Opinion 136 states that an attorney may deposit client funds into an operating account only where an attorney fee is "earned upon payment." *Utah State Bar Ethics Advisory Op. 136,* 1993 WL 755253, at *3.

¶98 Bowen has identified no basis for a conclusion that he is "in compliance" with this standard under the Brinson contract (or any of the other contracts). He has not asserted that any of the fees in question were earned upon payment under the standard set forth in Opinion 136.[39] He is asking us to override that standard—in advancing an argument in line with one we rejected in *Utah State Bar v. Jardine,* 2012 UT 67, 289 P.3d 516.

¶99 The safe harbor rule, as amended in 2012, no longer requires that an attorney's conduct be "expressly approved" by the terms of an ethics opinion. *See supra* ¶¶ 60–62. Implicit approval is sufficient. But there must still be approval. And an attorney's conduct is "in

---

[38] Like the majority, I refer to the safe harbor rule as rule 14-504(d) despite the rule having been renumbered as rule 11-522. *See supra* ¶ 51 n.13. Because "that version of the Safe Harbor Rule was in effect when the district court ruled on summary judgment," it is the one applicable here. *See id.*

[39] As explained below, Bowen's position is that a flat fee can qualify as "earned when paid" if the client considers it to be earned and the attorney has designated it as such in a fee agreement. But this is not consistent with the standard set forth in Opinion 136. It is an attempt to override it.

compliance" only if it is in line with the legal standard set forth in the ethics opinion. There is no safe harbor that applies under the rule on the ground that a "reasonable attorney" could interpret an ethics opinion to endorse his conduct. *But see supra* ¶ 64 (adopting this position).

¶100 I would affirm the district court across the board on this basis. I would hold that Bowen failed to establish a basis for safe harbor protection because his conduct is not "in compliance with" Opinion 136.

¶101 For similar reasons, I would not conclude that Opinion 136 was "effectively withdrawn" by our opinion in the *Jardine* case. *See supra* ¶ 57 n.14 (so holding). *Jardine* does not alter or withdraw Opinion 136 in any manner. It reinforces the governing standard — in holding that the ethics opinion establishes "the fundamental requirement that" fees "must be earned before" they may be deposited in an operating account. *Supra* ¶ 36 (quoting *Jardine*, 2012 UT 67, ¶ 53).

¶102 I explain my reasoning further in the paragraphs below. I first present the basis for my understanding of the "in compliance" language of the safe harbor rule and then address the question of "withdrawal" of Opinion 136. Next, I explain the basis for my conclusion that Bowen was not in compliance with Opinion 136 (even implicitly) when he deposited client funds in his operating account. And I close with some observations on the Chief Justice's proposal for application of the rule of lenity to a case like this one. *See supra* ¶ 86.

I

¶103 The safe harbor provision of our rules of professional practice extends to "conduct that is in compliance with an ethics advisory opinion that has not been withdrawn at the time of the conduct in question." SUP. CT. R. PRO. PRAC. 14-504(d) (2019), *amended by and renumbered as* 11-522 (2020). Applying this rule, the majority concludes that (a) an attorney can establish that he is "in compliance" with an ethics opinion by showing that his conduct was within a reasonable but incorrect reading of such opinion; but (b) Ethics Advisory Opinion 136 was "withdrawn" in part by this court in our opinion in the *Jardine* case. I disagree with both conclusions.

LEE, A.C.J., concurring in part and dissenting in part

A

¶104 We amended the safe harbor rule in 2012. *Supra* ¶¶ 60–61. The previous iteration of the rule "required that an attorney's conduct be '*expressly approved*' by an ethics opinion" to fall within the safe harbor. *See* SUP. CT. R. PRO. PRAC. 14-504(d) (Mar. 5, 2012); *supra* ¶ 60 (emphasis added). But in 2012 we adopted a rule requiring only that the attorney's conduct be "in compliance" with an ethics opinion. SUP. CT. R. PRO. PRAC. 14-504(d) (Nov. 1, 2012); *see supra* ¶ 60.

¶105 The amended rule is thus "slightly broader" and a bit "more forgiving" than the rule in place when we issued *Jardine*. *Supra* ¶ 61. An attorney may now qualify for safe harbor protection even if his conduct is not expressly approved; implicit approval is enough.

¶106 Approval is still required, however. The conduct at issue must be "in compliance" with the ethics opinion. And the scope of an opinion's approval can be established only upon a determination of its operative terms and conditions.

¶107 An attorney who advances a reasonable but incorrect view of the standard set forth in an ethics opinion has not established that he is "in compliance." *But see supra* ¶ 62 & n.17 (endorsing this view, so long as the attorney is not "on actual or constructive notice that her interpretation is incorrect"). He has merely shown that reasonable minds can differ on a determination of the governing standard. And that is insufficient under our rule.

¶108 The amended rule, as written, opens the door to a showing of implicit approval. Such approval could be established, for example, by a showing that the attorney's conduct is not expressly identified in the rule but nonetheless falls within the legal standard set forth in the opinion. But again, it is not enough for an attorney to show that he has a reasonable but incorrect view of the operative legal standard.

B

¶109 The majority concludes that an ethics opinion is "effectively withdrawn" when this court "issue[s] an opinion that contradicts an advisory opinion." *Supra* ¶ 57 n.14. In the court's view, an attorney is thus not "obligated to conform his behavior to all possible interpretations" of an advisory opinion, but he is "obligated to follow ours." *Supra* ¶ 57 n.14.

¶110 The Chief Justice identifies a different view in his dissent. He suggests that withdrawal may require some sort of formal action — express withdrawal by the Ethics Advisory Committee or formal repudiation by this court. *Supra* ¶ 90. And he notes that neither of those things happened here. This court "did not explicitly withdraw

LEE, A.C.J., concurring in part and dissenting in part

Opinion 136 in *Jardine*"; "we endorsed it, and it remains available to the public in its original form." *Supra* ¶ 90.

¶111  I see no need to resolve this interpretive question here because *Jardine* neither contradicted nor implicitly withdrew any portion of Opinion 136. *Jardine* is fully in line with and merely reinforces Opinion 136, as explained below. And it was thus not "withdrawn" under any interpretation of that term.

II

¶112  Ethics Advisory Opinion 136 addresses the question whether "an advance payment made by a client" can "ever be characterized as a 'fixed fee' or 'nonrefundable retainer'" that "would be earned by the attorney when received and therefore not deposited into a trust account." *Utah State Bar Ethics Advisory Op. 136*, 1993 WL 755253, at *1. It frames an answer to that question by reference to "the standard of Rule 1.5" of the Utah Rules of Professional Conduct — the proviso "that an attorney 'shall not enter into an agreement for, charge[,] or collect an illegal or clearly excessive fee.'" *Id.* (quoting UTAH R. PRO. CONDUCT 1.5(a) (1993)). And it holds that a fixed-fee arrangement resulting in payment into an "attorney's operating account" is permitted only in circumstances in which the fee is "considered earned when paid." *Id.*

¶113   The opinion cites scholarly commentary and case law from other jurisdictions in support of its conclusions. Based on these sources, the opinion (a) identifies specific circumstances in which fees may qualify as "earned when paid," *id.* at *2, (b) prescribes grounds for a later refund of such fees (or portions of them) when the expected basis for their being earned is not ultimately fulfilled, *id.* at *3, and (c) sets forth requirements for the terms of a fee agreement that will facilitate the enforcement of the operative standards set forth in the opinion. *Id.*

¶114  The opinion emphasizes that a lawyer cannot "automatically insulate[] himself" by merely "designating a retainer as 'nonrefundable.'" *Id.* at *2. The question is not how the fee "is treated in the fee agreement." *Id.* at *3. It is whether there is a basis for concluding that the fee is "earned when paid." *Id.* at *2.

¶115  The opinion expressly identifies "some contexts" in which a prepaid fee would "definitely" be considered earned when paid. *Id.* One is where "a lawyer's commitment to be available has value in and of itself," as with "complex commercial or criminal litigation," or a case in which the lawyer's "towering reputation" may be expected to "cause a threatened lawsuit to vanish." *Id.* Another is where "an attorney's acceptance of a matter, even for a short while, may, on conflicts grounds, disqualify the attorney and his firm from accepting

LEE, A.C.J., concurring in part and dissenting in part

other matters." *Id.* "A fixed-fee agreement in these instances compensates the attorney in part for accepting that conflict." *Id.* And the opinion concludes that a fixed fee in these instances could be viewed as "earned upon payment" and thus subject to being deposited in an operating account. *Id.* at *3.

¶116 That said, the opinion also states that the notion of a "nonrefundable" fee "really is a misnomer." *Id.* at *2. The expected basis for treating the fee as "earned when paid" may not ultimately be fulfilled. And when that occurs as a result of "changed circumstances," the client may have a right to a refund from the attorney's operating account. *Id.* at *3. "If the lawyer performs no legal services, obtains no benefits for the client and has not lost other employment opportunities as a result of agreeing to represent the client," the fee (or some portion of it) may no longer be earned as expected. *Id.* at *2. Such a fee could then be "excessive" if the attorney "refused to refund" the excessive portion to the client.[40] *Id.*

¶117 The opinion closes by emphasizing that the question of excessiveness "depends on whether the total fee meets the standards set out" in the opinion under rule 1.5 "and not on whether any part of it is *treated in the fee agreement* as nonrefundable." *Id.* at *3 (emphasis added). Yet it concludes by stating that "[t]he fee agreement should, however, clearly set forth (a) what portion of the retainer is considered to be nonrefundable, (b) that nonrefundability is conditioned on the absence of default by the lawyer, and (c) what circumstances may entitle the client to a disgorgement of all or part of the 'nonrefundable' amount." *Id.* "Since the 'nonrefundable' portion is considered earned upon payment, it may be deposited into the attorney's general operating account rather than in his trust account." *Id.* "However, the attorney may be required to return a portion of the fixed fee if the fee is clearly excessive under Rule 1.5 (a) as a result of changed circumstances, (b) failure to perform the requested services, (c) failure to convey any benefit to the client, and (d) the lawyer suffered no lost employment from the engagement." *Id.*

¶118 These are the operative terms and conditions of Opinion 136. And they provide no basis for safe harbor protection for Bowen — under any of the contracts at issue. Bowen has not asserted that the fees under any of these contracts met the standard set forth in Opinion

_____

[40] The majority credits the "refund" discussion in the opinion as a "reasonable" basis for Bowen's position. *See supra* ¶¶ 66–67. It concludes that Bowen may have reasonably "believed, based upon his reading of the Opinion, that he would only need to show a 'benefit' to the client *when calculating [a] refund*" to his client. *Supra* ¶ 67 (emphasis added). I see no basis for that position in Opinion 136.

136. He has identified no basis for a conclusion that any of these fees were "earned when paid." And he thus cannot establish that he was "in compliance with" this opinion when he deposited these fees into his operating account.

¶119 Safe harbor protection could be available to an attorney despite the fact that the basis for finding a fee "earned when paid" is not set forth *expressly* in Opinion 136. *See supra* Part I. Bowen is therefore not confined to the specific circumstances identified in the opinion. His conduct, however, must still be "in compliance" with the standard set forth in the rule—the fees must have been "earned when paid." And he fails to qualify for safe harbor protection because he has not identified any basis for such a conclusion.

¶120 Bowen is instead advancing a different view—one that effectively overrides the standard set forth in Opinion 136. He is asking us to read the opinion to allow him to deposit fees into his operating account so long as his written agreement with his client "clearly set forth, (a) what portion of the retainer is considered to be nonrefundable, (b) that nonrefundability is conditioned on the absence of default by the lawyer, and (c) what circumstances may entitle the client to a disgorgement of all or part of the 'nonrefundable' amount." This argument is indeed based on some language quoted from the opinion. But the language is quoted out of context. In context, these are not "conditions" for "establish[ing] that a fee was 'earned when paid.'" *Supra* ¶ 63. They are requirements aimed at facilitating the effective operation of the governing legal standard.

¶121 This is the clear standard set forth in Opinion 136. And it is further reinforced by our rejection of an argument like Bowen's in *Utah State Bar v. Jardine*, 2012 UT 67, 289 P.3d 516. Like Bowen, Jardine asserted that he was entitled to safe harbor protection under Opinion 136 because he formatted his fee agreements in a manner consistent with Opinion 136—in stating "(a) what portion of the retainer is considered to be nonrefundable, (b) that nonrefundability is conditioned on the absence of default by the lawyer, and (c) what circumstances may entitle the client to a disgorgement of all or part of the 'nonrefundable' amount." *Id.* ¶ 52 (quoting *Ethics Advisory Op. 136*, 1993 WL 755253, at *3) (internal quotation marks omitted). But we rightly rejected this view as incompatible with the terms of the opinion. We explained that "the guidelines of Opinion 136" on the terms of a fee agreement "support, not supplant, the fundamental requirement that the money must be earned before it is withdrawn." *Id.* ¶ 53. And we concluded that Jardine was not entitled to safe harbor protection because he "ha[d] not provided us with any reason to believe" that his representation of his clients was "of the type that would cause money to be earned upon receipt." *Id.* "He ha[d] not

demonstrated that he provided a substantial benefit for his client by virtue of having a 'towering reputation,' that his commitment to be available had value in and of itself beyond the usual attorney/client relationship, that his acceptance of the matters disqualified him from accepting other matters, or any similar exception to the general rule." *Id.*

¶122   The *Jardine* case admittedly was decided under the prior iteration of our safe harbor rule. *See supra* ¶ 60 (so noting). But the amendment is a distinction without a difference here. As explained above, the rule still requires a showing that an attorney's conduct is "in compliance with" an ethics opinion. And Bowen has not shown that any more than Jardine did.

¶123   Jardine's position was perhaps more defensible than Bowen's is. He had at least "tried to argue" that his fees were "earned upon receipt" because he provided his client "'peace of mind' at a rate of $500 a month." *Jardine*, 2012 UT 67, ¶ 53. We rejected this argument. We held that "[p]eace of mind" was "an amorphous concept," and was "difficult for us to measure and value." *Id.* ¶ 39. And we noted that Jardine was entitled to safe harbor protection under the then-applicable rule only if he could show that his conduct "was expressly approved" by an ethics advisory opinion. *Id.* ¶ 40. The "peace of mind" notion of "earned when paid" was not expressly enumerated in Opinion 136. *See id.* ¶ 53. And we concluded on that basis that Jardine was not protected by the safe harbor. *Id.*

¶124   The current rule, again, is different. But the difference does not help Mr. Bowen. Unlike Jardine, Bowen has not identified *any* basis in Opinion 136 — explicit or implicit — for concluding that his fees were earned when paid. And without such an argument, Bowen cannot establish that he is in any way "in compliance with" the ethics opinion.

¶125   Bowen may not have had the "benefit" of the *Jardine* opinion when he entered into the Brinson contract.[41] *Supra* ¶ 58. But he had the benefit of Opinion 136. And the *Jardine* opinion did not "supplant" or otherwise withdraw "the fundamental requirement that the money must be earned before it is withdrawn." *Jardine*, 2012 UT 67, ¶ 53. It reinforced it. That standard forecloses Bowen's position under all of the client contracts in question.

_____

[41] By the same token, Bowen may not have had "notice that he must look beyond the text of the ethics advisory opinion to determine whether it had been 'effectively' withdrawn in whole or in part." *Supra* ¶ 91. But he did not need to look elsewhere, as the opinion itself established the governing standard.

III

¶126   I can appreciate a basis for sympathy toward an attorney in a position like Bowen. He may have believed he had a basis for depositing client funds into his operating account under the Brinson contract. He had no such basis, however. And Bowen's professed reasonable belief can be accounted for in the sanctions imposed by the district court on remand.

¶127   I would thus conclude that all of Bowen's motions for summary judgment were unfounded. I would affirm the district court across the board because I see no basis for a safe-harbor defense for fees deposited into Bowen's operating account under the Brinson agreement (or any of the other agreements).

¶128   I would likewise decline to resolve the case on the basis of the "rule of lenity" as advocated by the Chief Justice in his dissent. *See supra* ¶ 86. This court has never extended the rule of lenity beyond the realm of the criminal law. *See supra* ¶¶ 92–93 (citing Washington cases but no Utah cases that have applied the rule of lenity to attorney discipline proceedings). And Bowen has identified no basis for applying it in the attorney discipline setting, or for concluding that there is an ambiguity in the standard set forth in Opinion 136.

¶129   The rule of lenity is not even mentioned in the briefing in this case. So the parties have not had an opportunity to be heard on this question, and we are in no position to resolve the case on this basis.

¶130   It is true, as the Chief Justice notes, that "lawyers are entitled to procedural due process guarantees in disciplinary actions, including, [a]t a minimum, timely and adequate notice." *Supra* ¶ 92 (alteration in original) (citation and internal quotation marks omitted). But that proves too much, and is not a sufficient basis for application of the rule of lenity. The right to due process and fair notice likewise extends to parties in civil cases. Yet the rule of lenity does not apply in civil cases and it should not apply here—not only because this is not a criminal proceeding, but also because Opinion 136 is unambiguous in its articulation of the governing standard.

---